THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILSON JOHNSON, Appellant.

First Department, February 20, 1986

## APPEARANCES OF COUNSEL .

*Mary R. Falk* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Michael J. Eng* of counsel *(Jeremy Gutman* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

ROSENBERGER, J.

Wilson Johnson appeals from a judgment convicting him, following a jury trial, of robbery in the first degree and burglary in the first degree, rendered in the Supreme Court, Bronx County, on May 27, 1982. He is presently incarcerated, serving two concurrent sentences of imprisonment of from 6 to 18 years. We find the evidence less than overwhelming and the several trial errors to require reversal and a new trial.

According to the complainant, Frank Mendez, at about 1:30 A.M. on October 20, 1981, he heard a knock at the door of his home located at 772 Union Avenue in The Bronx, lifted the curtain on the window and saw Edwin Andujar, the superintendent in one of the four buildings he owned, standing outside with Fernando Rodriguez and the defendant. Upon his request that they return the next day, the trio left. Shortly thereafter, Mendez heard an upstairs window break, grabbed a crowbar, went upstairs, and confronted Andujar and two other intruders. The defendant allegedly knocked the crowbar out of his hands, put a knife to his throat, dragged him downstairs, and removed approximately $350 from his pockets. He then allegedly threatened, in Spanish, to take Mendez upstairs and kill him unless he told him where there was more money. At some point the defendant allegedly gave the knife to Rodriguez. The perpetrators took a television set, shirts, a watch and a tape recorder, tied Mendez up, ripped out his phone wire, and fled. The crime transpired in about 10 or 15 minutes.

The defendant's principal argument for reversal concerns the admission of testimony that he had stolen money from Mendez on about 10 prior occasions within eight months of the robbery and burglary at issue. He claims that this "prior crimes" evidence was neither probative of identity, nor of a common scheme under *People v Molineux* (168 NY 264, 305-306, 313-316 [1901]). Although the minutes of the pretrial hearing at which Criminal Term (Goldfluss, J.), determined that the "prior crimes" evidence was admissible have apparently been lost or misplaced, in our view the ruling was an abuse of discretion. The 10 uncharged larcenies were allegedly committed, usually after Mendez returned from collecting rents, when Andujar would hold him while defendant emptied his pockets. Their threats to burn Mendez' building down or to expose his practice of illegally cashing welfare checks, his acquaintance with Benny Andujar, and his intimate relationship with the latter's "common-law wife", Carmen Escalera, allegedly kept him from reporting the incidents to the police.

With respect to the "common plan or scheme" exception, the forcible entry and violent robbery at issue and the prior uncharged offenses were neither connected parts of a common scheme, nor so related as to show a common nature. *(People v Molineux, supra,* at p 305.) There was no evidence of a concurrence of common features, i.e., time, place, and character or of distinguishing oddities linking these dissimilar crimes. *(See, People v Allweiss,* 48 NY2d 40, 47-48 [1979]; *compare, People v Grant,* 104 AD2d 674, 675 [3d Dept 1984].) The *modus operandi* of the burglary and violent robbery at issue also lacks sufficient similarity with the prior larcenies to have any significant bearing upon the identity issue. A proper balancing of the probative value of prior crimes evidence against its prejudicial effect militates against admissibility where, as here, proof of defendant's prior criminality was, at best, cumulative in nature and unnecessary to establish any material element of the People's case. *(People v Ventimiglia,* 52 NY2d 350, 360 [1981]; *People v Blanchard,* 83 AD2d 905, 906 [2d Dept 1981].) The victim and two of defendant's alleged accomplices, Andujar and the lookout at the front door, Frankie Nieves, whom Mendez failed to identify, testified for the People and identified defendant as a perpetrator of the crimes at issue.

It should be noted that all of the "prior crimes" evidence came from witnesses who testified, directly, that they had seen the defendant commit the crime at issue. Coming from several

alleged eyewitnesses who identified defendant, such evidence cannot be other than cumulative. Because of the great danger of prejudice to a defendant from a jury's considering such evidence as an indication of a predisposition by the defendant to commit the crime at issue, evidence of prior crimes should be admitted only where there is a demonstrated necessity for its receipt into evidence, not where it is simply cumulative.

The prejudice to the defendant is underscored here, by the court's omission to give proper limiting instructions describing the proper use of the uncharged crimes evidence, either when the evidence was adduced, or in its final charge to the jury. (See, People v Beam, 57 NY2d 241, 250 [1982]; People v Sudler, 100 AD2d 915, 916 [2d Dept 1984].) Assuming, arguendo, that the error concerning the lack of proper limiting instructions was not preserved, we reach it in the interest of justice. (CPL 470.15 [6].)

Such failure was clearly demonstrated by the prosecutor's closing argument. In his summation, the prosecutor compounded the prejudicial effect of the improper *Molineux* testimony by arguing that the defendant was guilty because of his criminal propensity. He urged the jury to convict the defendant, saying: "Wilson Johnson, having ripped Mr. Mendez off repetitively over eight months, ripped him off on October 20, 1981". In response to the defendant's objection, the court did not give any limiting instruction. Rather, it instructed the jurors that they were free to accept or reject the Assistant District Attorney's conclusion. This again was error.

The court also erred in permitting the People, over objection, to elicit, on redirect examination, a hearsay statement of private investigator Alan Porcher. Porcher had been retained by the defendant, had interviewed Mendez in Carmen Escalera's presence on February 15, 1982, and had prepared a report. The People called him to testify as to the dates of his interviews of Mendez, and whether the interviews were tape recorded. On cross-examination, the defense explored some of the content of the interviews and the reports, i.e., Carmen Escalera's account of the burglary and arrest; her misrepresentation that the police had found the defendant's fingerprints on the stolen television; her evasive answer when asked whether her nephew Frankie Nieves (the lookout) had returned the television to Mendez; and Mendez' statement that she had told him that her husband's participation in the robbery was coerced.

The prosecutor objected to this line of questioning, but withdrew his objection upon examining a copy of the report. After a colloquy with counsel, the court ruled that "we're not going to hide anything from the jury" and, over objection, permitted the People on redirect examination to elicit Escalera's statement that the defendant's brother had offered to return the stolen money and property if Mendez would drop the charges.

While a report prepared in the ordinary course of business may, in proper circumstances, qualify for admissibility under the business record exception to the hearsay rule, statements contained in that report, made by one person to another to whom he has no duty to report, constitute inadmissible hearsay. *(Matter of Leon RR,* 48 NY2d 117, 122-123 [1979].)

There is no "full disclosure" exception to the rule against hearsay. The People's belated contention, on this appeal, that the defense "opened the door" to such redirect examination is unpersuasive. The "opening the door" theory would only allow a party to introduce the entirety of a statement where necessary to explain or clarify those parts of the statement brought out on cross-examination. *(People v Melendez,* 55 NY2d 445, 452 [1982].)* Criminal Term should have excluded Escalera's statement to Porcher on the People's redirect examination of him since it was unreliable, highly prejudicial and neither explained nor clarified the statements on cross-examination introduced regarding Mendez' state of mind. Finally, the cautionary instruction that no inference should be drawn connecting the statement with the defendant was inadequate. The instruction allowed the jury to infer that the statement was in fact true, although the defendant had nothing to do with his brother's action.

The court further erred in permitting the People to call a rebuttal witness to impeach the testimony given by one of defendant's alibi witnesses, his "common-law wife" Sylvia Yvette Correa, on a collateral matter. The prosecutor, on cross-examination, asked Correa whether Rafael Carreros, a friend of her cousin Frankie Nieves, had asked her to return the stolen television to Mendez. She denied that she had such a conversation with him. The prosecutor was then permitted to elicit testimony from Carreros that he had spoken to Correa as a favor to Nieves on the evening of October 20, and that she told him the television was at Escalera's house, not hers. Carreros' testimony had no independent relevance and no bearing upon a material aspect of Correa's alibi testimony.

The prosecutor should not have been allowed to call Carreros as a witness to impeach Correa's testimony, as to a collateral matter, elicited on cross-examination. (Richardson, Evidence § 491 [Prince 10th ed]; Fisch, New York Evidence § 486 [2d ed].)

The magnitude and cumulative effect of the trial errors, and the prosecutor's improper arguments during summation deprived the defendant of a fair trial. Since these cumulative errors operated to deny the defendant his fundamental constitutional right to a fair trial, reversal is appropriate irrespective of any evaluation of whether, excising errors, the evidence of guilt was otherwise conclusive. However, careful study of the record reveals that even if the cumulative errors were not constitutional in dimension, reversal is mandated since they were not rendered harmless by overwhelming evidence of guilt. (People v Crimmins, 36 NY2d 230 [1975].)

The People's case rested on three eyewitnesses, whose testimony was problematic and riddled with inconsistencies. Mendez' testimony presented a substantial identification issue. He was 78 years of age and blind in one eye, due to glaucoma. In his testimony before the Grand Jury he described the robbers who accompanied Andujar as one short, fat and dark-complexioned man and another tall man. At the *Wade* hearing he testified that both were clean-shaven, and that the tall one was Spanish-speaking and wore a red shirt with a collar and buttons.* The defendant took every opportunity to point out that when arrested he had a mustache, beard and was wearing an orange sweatshirt with a white "Puma" insignia. He also adduced testimony that he had a limited vocabulary of Spanish words, and rarely used them. Mendez attempted to explain these discrepancies by claiming that he was too frightened to observe anything about the intruders. His admittedly intimate relationship with Escalera, his attempt to conceal the fact that he had accompanied her to an interview with her husband's attorney and had requested lenient treatment for Andujar, further undermined the strength of the prosecution's case. The interview of December 24, 1981, which had been taped and was admitted into evidence at trial, also revealed that Escalera had to prompt Mendez as to the defendant's name.

---

* Mendez' description of the short man at the trial, coincidentally matched the appearance of Petey Flores, Andujar's best friend. Andujar testified that he and Flores had taken Mr. Mendez' money on several occasions.

Both Andujar and Nieves, the defendant's alleged accomplices, negotiated minimal sentences in exchange for testimony against the defendant and Rodriguez. Each admitted a willingness to lie when there was something to be gained, in the case of Andujar, or to avoid imprisonment, in the case of Nieves, respectively. Andujar's representation to the Judge who accepted his plea that his participation in the crime as the "lookout" was coerced, varied substantially from his account at trial. More significantly, Andujar admittedly considered the defendant his "arch-enemy". He further testified that there had been "bad blood" and animosity between them prior to the crimes at issue. The motive to lie was clear.

Consequently, the judgment of the Supreme Court, Bronx County (Goldfluss, J.), rendered on May 27, 1982, convicting the defendant, following a jury trial, of robbery in the first degree and burglary in the first degree, and sentencing him to two concurrent terms of imprisonment of from 6 to 18 years, should be reversed, on the law and as a matter of discretion in the interest of justice, and the matter should be remanded for a new trial.

SANDLER, J. P., SULLIVAN, MILONAS and KASSAL, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on May 27, 1982, unanimously reversed, on the law and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.