THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOEY SANZA, Appellant.

First Department, December 9, 1986

## APPEARANCES OF COUNSEL

*Jeffrey Stein* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Robert M. Raciti* of counsel *(Donald J. Siewert* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

FEIN, J.

Defendant stands convicted after a jury trial of murder in the second degree and rape in the first degree, for which he was sentenced to consecutive, indeterminate prison terms of 25 years to life on the murder charge and 8⅓ to 25 years on the rape charge. He has not yet begun to serve his sentence, since he is currently incarcerated in Florida on unrelated criminal matters.

In March 1983, two police officers went to Florida to interview defendant in connection with the investigation of the November 1982 rape and murder of Theresa Cha. At the time, defendant was imprisoned in Florida. Prior to interviewing defendant, the officers contacted his attorney who agreed to the interview. When all four met, neither detective gave *Miranda* warnings to defendant. They later argued that the investigation was still in a preliminary stage; moreover, defendant's attorney was present during the interview.

During the interview, the officers displayed a wedding ring to defendant, which was almost identical to a ring stolen from the victim when she was murdered. Defendant repeatedly stated that he had never seen the ring or any ring like it, and that he had not been at work on November 5 through 6, 1982 because he had been ill and had stayed at home.

At the conclusion of the hearing, on defendant's motion to suppress his statement, the court found that defendant's

constitutional rights had been protected by the presence of counsel during the questioning, and that *Miranda* warnings were not necessary. Since the statement appeared to have been knowingly and voluntarily made, the court held that it would be admissible upon the trial.

Before commencement of trial, the prosecution moved for leave to submit evidence of three rapes to which defendant had pleaded guilty in Florida. It was contended that the Florida rapes would establish a pattern identifying defendant as the person who raped and killed Mrs. Cha. The People's contention was that the evidence respecting the Florida rapes would demonstrate a pattern of subterfuge, the use of a weapon, defendant's concern with the heads of his victims and the theft of rings from his victims.

Defendant's counsel vigorously objected, pointing to the devastating effect such testimony would have. He urged that the pattern of activity alleged by the prosecutor was not unique; nor would it in any way serve to identify defendant. It would only show defendant's alleged propensity for committing rape and murder.

Ultimately, the court ruled that the evidence was admissible because the victim was unavailable to identify her assailant. The issue of whether the pattern was similar or not was ruled to be for the jury. Accordingly, the three women from Florida were permitted to testify on the People's direct case concerning their respective rapes perpetrated by defendant.

The evidence at trial also established that on November 5, 1982 Mrs. Cha was on her way to meet her husband when she was allegedly attacked by defendant. She and her husband were supposed to meet at 5:00 P.M. When she did not appear, her husband went to have a drink with some of his friends. Earlier that day, at about 3:00 P.M., defendant, who worked as a security guard in the same building as the victim's husband, spoke with one Gibson, who asked him to supervise the unloading of a van used in the renovation of the building. Gibson gave defendant the keys to the vehicle which was parked outside in a back alley. The victim's husband, a photographer for the renovation project, had an office in the basement, not far from where defendant had a locker which contained his guard's uniform and nightstick. The floor of the van was covered with various materials, including straw and debris, from the work on the renovation project.

Mrs. Cha left her place of work at the Metropolitan Mu-

seum of Art at 4:30 P.M. to meet Kenji Fujita, the owner of an art gallery, which was about a 15-minute walk from the building where she was to meet her husband. She met Fujita sometime before 5:00 P.M. and left before dark. This was the last time she was seen alive.

Defendant "punched out" at 5:15 P.M. but did not leave the building. Sometime between 5:00 and 5:30 P.M. he gave the keys for the van to the security guard at the front desk. At 6:05 P.M. he was seen leaving the building by the security officer. However, he returned around 7:10 P.M., explaining to the guard that he had forgotten his bag. He went downstairs to his locker and returned 15 minutes later, carrying an overnight satchel and a red shopping bag.

At 7:15 P.M., Police Officer Brennan responded to a call for an investigation of a parking lot on Elizabeth Street, which is located about 10 or 15 minutes by car from the office building in which defendant worked. At the parking lot, the officer found the body of Mrs. Cha. Her pants and underwear were down around her knees, she had only one boot on and there was blood on the back of her head. Her wedding ring was missing as well as her purse and wallet, but her Timex wristwatch was still in place.

At 7:30 P.M., defendant returned to an apartment in Brooklyn, occupied by his sister and two of her friends. Defendant had been staying there since he arrived in New York in September 1982. When defendant returned to the apartment, one of the women had just come out of the bathtub. He asked if he could use the draining water to wash his hair. He did so and later, at 10:00 P.M., he asked his sister if he could use her car. She noticed that he was wearing a pinkey ring that she had never seen before. The ring was made of white gold with red and black stones on the top.

From 10:15 P.M. to 3:15 A.M. on the night of the crime, the victim's husband made many efforts to locate his wife, without success. Finally, at 3:15 he went to the police station to report her missing, and was taken to the morgue where he identified her body. The husband told the police that his wife wore a distinctive wedding ring made of white gold with an ebony stone in the center and red coral stones on the side, which was identical to the one worn by him except that the stones in his ring were in a reverse configuration.

Defendant did not show up for work on November 6, as scheduled. He stayed home until late afternoon. When every-

one else left, he ransacked the apartment and stole over $1,000 worth of jewelry and the belongings of his sister and the other two occupants. He then left the apartment and never returned.

On November 6 or 7 defendant met with one Michael Weinstein who noticed scratches or a bruise on defendant's arm. Defendant told Weinstein that he had been in a fight with a "bum" in the office building. He claimed he hit the man on the head with his nightstick and hurt him very badly. He thought he had killed the man because an ambulance had to come and take the man to the hospital. At trial it was demonstrated that no ambulance had been dispatched in that area at any time in early November 1982.

Weinstein also noted the ring defendant was wearing which, Weinstein said, made him look effeminate. After talking about the ring, defendant told Weinstein that he had $1,000 in cash which represented all the back pay due from his security job. The prosecution proved that defendant was actually owed only $800 in back pay, which was never paid because defendant failed to return to pick it up.

The police were initially unable to ascertain where Mrs. Cha had been murdered. However, her husband and her brother searched the building where defendant worked and found a room the police evidently had overlooked. Inside they found the victim's other boot, gloves, hat and button. There was also blood on the floor and a pattern of scrape marks which were consistent with the abrasions found on the victim's body.

The medical examiner's testimony showed that Mrs. Cha had been killed within a few hours of the time she was found. Death was caused by strangulation, which finding was consistent with the scarf and belt found tied around her neck. The medical examiner further testified that the lacerations on the victim's head could have been caused by a nightstick.

Expert testimony showed that defendant's boots, which had been left at his sister's apartment, had type A blood on them. This was consistent with the blood type of both the victim and defendant. Blood found on defendant's uniform hat was in such small quantity that the type could not be accurately ascertained. Swabs taken from rectal and vaginal smears of the victim revealed seminal fluid containing type A blood groups, but because of defendant's status as a nonsecretor, this blood could not have been his.

During their investigation, the police learned that defendant had been arrested in Florida and later convicted after pleas of guilty to three rapes there. In each case he had told the woman that he "wanted to make love", and then put a revolver against the victim's head as a threat. At each Florida trial, the victim testified that defendant had said he did not want to hurt her. In one case, he changed his mind about taking jewelry because the victim resisted with fervor. However, he did attempt to steal purses and several items of jewelry from each.

On appeal, defendant has made several assignments of error. We are concerned only with two, having examined the other claims and finding them to be without merit. The first issue is whether proof of defendant's prior rape convictions should have been received as probative of identity or of a common scheme or plan *(People v Molineux,* 168 NY 264).

It has long been settled that when a person is charged with one crime, evidence that he committed other similar crimes is inadmissible if offered solely to establish criminal propensity. However, such evidence is admissible if it meets the so-called *Molineux* standards, i.e., tending to establish "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial" (168 NY, at p 293). These categories are "merely illustrative" *(People v Vails,* 43 NY2d 364, 368), "not exhaustive" *(People v Santarelli,* 49 NY2d 241, 248), and the rule cannot be stated with "categorical precision" *(People v Molineux,* 168 NY, at p 293).

The basis for the rule is the human tendency more readily "to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime" *(People v Molineux,* 168 NY, at p 313; *People v Allweiss,* 48 NY2d 40, 47; see, *People v Zackowitz,* 254 NY 192, 197-199). It is intended to eliminate the danger that a jury may convict in order to punish the person who is portrayed by the evidence as a person of criminal propensity, even though the evidence may not be sufficient for conviction beyond a reasonable doubt of his guilt of the crime with which he is charged. Obviously, the problem is to quantify the degree to which the testimony is probative, as compared to its prejudicial effect. The evidence must plainly be of more than slight

value and at least directly probative and substantially relevant *(People v Allweiss, supra).*

It is plain here that the evidence was offered and received solely upon the ground that it served to identify defendant as the rapist. All of the other evidence in the case was circumstantial. No one could be produced who had seen defendant in the company of the victim at or about the pertinent times. It has long been held that where the evidence of independent crimes is sought to be introduced for purpose of establishing identity, there must first be shown a pattern of behavior in the other crimes and the crime charged which is unique. If the "method used is not uncommon", the evidence of other crimes is inadmissible *(People v Allweiss,* 48 NY2d, at p 47).

The question thus presented is whether defendant's *modus operandi* was sufficiently unique to tend to establish his identity and accordingly permit use of the identity exception *(People v Molineux, supra; People v Allweiss, supra).* As those cases hold, the mere fact that similar crimes were attempted in a similar manner would not particularly aid in identifying a defendant unless the similarities were unusual enough to compel the inference that that defendant had committed both crimes. The defendant's procedure must be sufficiently unique as to make the evidence of the uncharged crimes probative. As stated in *People v Condon* (26 NY2d 139, 144), "the *modus operandi*" must be "so unique" that the "identifiable characteristics" would be "highly probative" that the defendant committed the crime charged. In each of the authorities where such evidence was found to be admissible, there was a remarkably unique pattern of behavior common to each of the uncharged crimes *(People v Allweiss, supra; People v Beam,* 57 NY2d 241). In our case, the testimony said to be unique is that defendant expressed interest in the rings of the three victims and took rings either from the victim herself or from a jewelry box located in the apartment where the victim was attacked. Further, the three women had guns pointed at their heads and were threatened with immediate physical harm. In our view, there was nothing remarkable or unique about such behavior in the course of a rape or murder.

It is notable that, so far as appears in the case now before us, defendant allegedly beat and strangled the victim and did not use a gun. The contention is that this occurred because the victim could identify defendant. This is hardly distinctive. The rape and murder of Mrs. Cha had nothing in common with defendant's *modus operandi* in the three other cases. As

stated in *Allweiss* (48 NY2d, at p 47), "Simply categorizing the defendant as one of many criminal specialists [is] of little probative value". Defendant did not take the ring of one of his Florida victims from her hand, nor did he force another to part with her wedding rings when she refused.

A brief summary of the testimony of the three Florida victims demonstrates the point. The first, a 67-year-old resident of Pompano Beach, testified that she was raped in her apartment after being awakened at 4:00 A.M. The man, whom she could not identify, said he wanted to "make love" to her. She told him he was "a nice young man". Defendant pleaded guilty after being identified by fingerprints. He stole a purse and two jewelry boxes, but he did not remove the ring from her finger.

The second Florida victim, 21 years old, was raped between 9:30 and 10:30 P.M., while she was watching T.V. in her apartment. Defendant put a gun to her head and told her to take off her clothes. He performed oral sex on her and then intercourse. He stole two rings. She reported to the police that he was very polite and he told her he wanted to "make love" to her.

The third Florida victim saw defendant as she was taking out the trash at 1:30 P.M. When he complimented her on her bathing suit and told her he was new in the building, she invited him into her apartment. After tea, he grabbed her arm and put a gun to her head. He threatened her and told her to go into the bedroom and remove her clothes, which she did. He then put his gun down and took off his clothes. When she refused to perform oral sex, he said "all right". He then had intercourse with her although she was sobbing and he had tears in his eyes. He tried to grab her wedding rings, but she told him he could not have them. He then took $30 that fell out of her bathing suit, but made no attempt to force her to give up two jewelry boxes which she grasped.

■ As the foregoing descriptions of the three rapes to which defendant pleaded guilty demonstrate, there was hardly a unique characteristic in the rapist's procedure. Those descriptions establish no plan in common with the rape committed in this case. Actually, the differences are more notable than the similarities. The three Florida rapes took place in apartment houses, in the victims' apartments. In the case before us, the crime was committed in an office building. Aside from the gun threat, the Florida rapist was relatively polite, as attested to

by the victims. In our case, there was a savage assault resulting in death. This does not demonstrate a common plan. The evidence of the three Florida rapes merely establishes that defendant is a convicted rapist. It provides no tendency to establish that he is the same person who raped and killed the victim in our case. Thus, such evidence should have been excluded because it was highly prejudicial and demonstrated a propensity to commit rape. It proved nothing about our case. Gunpoint threats and theft or attempted theft of jewelry are hardly "unique" or "uncommon" in rape cases.

█ The admission into evidence of defendant's statement to the investigating detectives during the Florida jail interview did not violate defendant's rights. The purpose of the *Miranda* warning is to protect uninformed suspects from the devices used by law enforcement officers in forcing suspects to speak without being advised of their rights, or from the consequences of what they might say. Defendant was represented by counsel when the appointment for the interview was made, and his attorney was present when the statement was given. The statement was clearly voluntary and no rights were denied *(Miranda v Arizona,* 384 US 436, 445-446).

Accordingly, the judgment of Supreme Court, New York County (James J. Leff, J.), rendered November 14, 1984, convicting defendant of murder and rape, should be reversed, on the law, the sentences vacated, and the matter remanded for a new trial.

Asch, J. P., Milonas, Rosenberger and Wallach, JJ., concur.

Judgment, Supreme Court, New York County, rendered on November 14, 1984, unanimously reversed, on the law, the sentences vacated, and the matter remanded for a new trial.