THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NICKY SANCHEZ, Appellant.

First Department, February 15, 1990

**APPEARANCES OF COUNSEL**

*Kerry Elgarten* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Susan Corkery* of counsel *(Phyllis A. Monroe* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

CARRO, J.

In this case, we are presented with the question of whether testimony regarding an unrelated but allegedly similar crime may be introduced in order to show modus operandi and identity, where defendant's identity is removed from issue.

*The Instant (Consolazio) Case*

The complainant in the instant case, Marilyn Pizzaro Consolazio, testified that in early April 1986, she was entering the Deauville Hotel on East 29th Street in Manhattan when defendant approached her and asked her if she was "Willie's" wife. Consolazio, a 24-year-old mother of two who was residing at the hotel, responded in the negative. Consolazio and defendant, who was also a guest at the hotel, then entered the elevator and rode together to the seventh floor, where their respective rooms were. Consolazio testified that defendant, who had a camera around his neck "was, you know trying to say something to me, flirting and I said I have a boyfriend." When the elevator reached the seventh floor, Consolazio and defendant went their separate ways without further conversation.

Consolazio further testified that two to three mornings later, on April 7, 1986, she left her room to bring her garbage to the seventh floor disposal area. At the time she was wearing nightclothes covered by a robe, and as she walked back to her room, defendant came behind her, pointed a "grayish" or light colored, square shaped, automatic gun to her head, pushed her door and entered her room with her. Consolazio asked defendant, whom she recognized as the man she had spoken with in the elevator several days earlier, "why are you doing this?" Defendant allegedly responded that Consolazio had "asked for it because [she] didn't pay him no mind."

According to Consolazio, defendant, who had two cameras— a 35mm and a Polaroid—around his neck, sat her down on the bed, telling her he wanted to take pictures. He removed her robe and had her strike poses both seated and standing on the bed. After those pictures were taken, he allegedly told her "now it's time for the nude pictures." Consolazio testified that she balked at this suggestion because her young daughters were in the room.

Consolazio recalled that in the course of this discussion, her telephone rang, and, upon answering it, she spoke to her friend Jeneanne, another Deauville resident; during this conversation, defendant simply watched Consolazio and her children. Consolazio told Jeneanne that she was in the shower and could not stay on the phone. Consolazio acknowledged that she made no mention of any intrusive presence in the room, although Jeneanne was in the same building and may have been able to obtain immediate assistance.

She further testified that as soon as she hung up the telephone, she tried to run to the door, but was physically prevented from doing so by defendant, who grabbed her. At this point her telephone rang a second time; once again she answered. Her then boyfriend, now husband, on the other end of the telephone, asked her what was wrong, to which she replied "nothing, I just woke up" and told him that all was well.

At the conclusion of the second call, defendant allegedly attempted to remove Consolazio's underpants. She again refused him, telling him that she did not want to engage in sexual activity in front of the children. Consolazio and defendant then went into the bathroom, leaving the girls outside. Consolazio stated that defendant, in closing the bathroom door, banged the head of one of the little girls, who was trying to follow her mother in.

Inside the bathroom, defendant allegedly pulled off Consolazio's oversized tee shirt, kissed her breasts and had her turn around so that he could kiss her vaginal area. Consolazio testified that defendant then had her get on her hands and knees on the bathroom floor, whereupon he had sexual intercourse with her. Afterwards, Consolazio was allegedly forced to write and sign a "consent" statement giving defendant permission to take photographs of her for money. However, she unequivocally stated that defendant at no time told her that he wanted to sell the pictures to a magazine or that he was a photographer who would make money for her by selling the photographs. Moreover, she asserted that there was no discussion between them as to whether or not she was a model.

Consolazio asserted that defendant held the gun during the entire incident, which lasted approximately 20 to 25 minutes. After the incident, defendant allegedly told her not to tell anybody about the encounter, but then said it did not matter because he was going to Florida. Consolazio subsequently gave police a detailed description of him and his clothing, including a distinctive gold neck chain, with an eagle pendant.

Defendant testified in his own behalf. His testimony was in agreement with Consolazio's insofar as that he had been a guest of the Deauville, among other hotels, in early April, that he had gone to Consolazio's room to take photographs of her (although he recalled a different date, two days earlier), and that he and Consolazio had had sexual relations. He thus placed in issue only the question of whether the sex was forced or consensual, having conceded identification.

Defendant testified that he met Consolazio while he and his common-law wife were staying at the Deauville approximately two weeks prior to the events in question, when he assisted her with her grocery cart in the hotel. He recalled that after they left the elevator, they chatted for 10 to 15 minutes. He next spoke to her on or about April 1st, while she and her daughters were on the elevator with him. Defendant testified that during that conversation, he asked Consolazio to pose as a model for some pictures. Consolazio allegedly agreed, saying it would be "no problem" and to call her in her room.

The next day, defendant visited Consolazio in her room, while her daughters and friend Tina were there. Upon learning that defendant was Colombian, Consolazio allegedly asked him to obtain cocaine for her; defendant asserted that he

declined to do this. Defendant stated that despite this refusal, Consolazio still was willing to pose for the pictures, depending upon how much defendant was willing to pay her. She did not pose on that occasion.

Defendant testified that he returned later that afternoon, while the children were asleep. Consolazio again told him she needed money. According to defendant, he gave Consolazio $50 and they then had consensual sexual relations in the bathroom. Defendant indicated that Consolazio did not pose for him that afternoon either.

Defendant testified that the next and last time he saw Consolazio was the morning of April 5, when he brought his cameras to her room to photograph her. He recalled asking if he could come into the room and being admitted with the caution that he could remain for only a short time, because Consolazio's "very jealous" boyfriend (now husband) was going to visit her and she did not want defendant to be seen by him. Defendant testified that he gave Consolazio the option of posing with or without her clothes and undergarments. He contended that she agreed to be photographed naked, with the exception of her panties, and allowed defendant to instruct her as to what poses to strike for the pictures. The two little girls were playing in the room throughout the photography session.

Defendant also testified that after he finished taking the pictures, he had Consolazio sign a consent form. He gave her $70 of the $200 they agreed upon as payment, promising to pay the remainder before he went on a trip to Florida. Defendant stated that he and Consolazio then went into the bathroom and engaged in consensual sexual relations. Defendant acknowledged that he never paid her the balance of the moneys supposedly owed her; he claimed that this was because he and his wife had an argument later on April 5, after which he checked out and went to Florida. Thus, his testimony was that he never saw Consolazio after April 5. Additionally, he denied possessing a gun while at the Deauville.

Consolazio was examined at Cabrini Medical Center on April 7, 1986, after she had already taken a shower. The physician who conducted the vaginal and cervical examinations testified that despite the shower, she was able to determine that there was no evidence of forcible entry or trauma. Moreover, while a "vaginal wash" did show the presence of spermatozoa, the police chemist who conducted the analysis

testified that the sperm could have been deposited up to 72 hours before the test.

## The Applications Regarding the Unrelated (Diaz) Case

The record reflects that immediately prior to trial, an application was made requesting a ruling as to whether the People would be permitted to adduce evidence of an unrelated attempted rape, of one Jessica Diaz, in Bronx County, in June 1986. The court declined to issue a final ruling at that point in the proceedings. However, the court did direct the attorneys not to refer to the Bronx case during their opening statements.

Prior to cross-examining Consolazio, defense counsel raised the issue again, adding that he would be "prepared to concede the identification issue" rather than have Diaz testify to an additional sex offense allegedly perpetrated by defendant. The court refused to make what it called an "anticipatory ruling" so that defense counsel could formulate strategy. The court did declare that "evidence of an uncharged crime is admissible provided the modus operandi is *so unique to make the case*" (emphasis added). The court added that if it was "satisfied as to the uniqueness and the issue of identity is raised" it might permit the Diaz testimony. However, the court refused to conduct a *Ventimiglia* hearing to determine the admissibility of the evidence. The court also denied defense counsel's application for a mistrial.

Upon the refusal of the court to issue a ruling on the application, counsel conducted his cross-examination of Consolazio. He included in his inquiry questions regarding the appearance of the man in the elevator, her room, and the composition of the lineup she subsequently viewed.

Later in the proceedings, defense counsel again renewed his request for a *Molineux* ruling as to whether Diaz would be permitted to testify. Counsel again explained that he would concede identification rather than have Diaz testify. The court stated that it would not rule until an offer of proof was made and the witness called.

It is noteworthy that counsel offered, more than once, to have defendant testify and admit to being with Consolazio at the approximate time and place of occurrence, and also offered to stipulate as to identification, in order to remove the issue completely.

Following the prosecutor's offer of proof, and over defense

counsel's objection, the court finally ruled that the Diaz testimony would be admitted because it went to "the question of identity and similarity of the circumstance of the crime, *both of them involving alleged attempt [sic] to take photographs*" (emphasis added).

## The Unrelated (Diaz) Case

Immediately before Jessica Diaz, the last witness to testify on behalf of the People, took the witness stand, the court instructed the jury that her testimony was "being admitted solely as it may tend to establish the identity of the person charged with commission of the crime presently on trial before you."

Diaz, a 19-year-old mother, testified that on June 9, 1986, at 11:15 A.M., while she was at a medical clinic, defendant approached her and began speaking to her about a modeling agency. He allegedly told her that the agency needed girls to model clothing. Although Diaz told him that she was busy running errands, she invited him to accompany her so that he could tell her more.

Diaz testified that defendant made small talk and told her that pictures of his models appeared in certain magazines and that he had made his fortune in the modeling business over the past 15 years.

Defendant accompanied Diaz to her pharmacy, where Diaz picked up six rolls of film she had left to be developed. She showed them to defendant who, in turn showed her photographs of him, his family, and other women. They also continued to discuss modeling, defendant telling Diaz that he had an agency in Manhattan and Queens. Diaz told him she would go to the agency.

Defendant suggested that Diaz bring some dresses to model, in case the dresses at the agency did not fit her. Diaz agreed and brought defendant to her apartment. She showed defendant three dresses, whereupon he asked if she had a bathing suit as well. Despite Diaz's protests that the suits were wet and hanging in the bathroom, defendant allegedly told her that this did not matter because she would need to model them wet in the photographs.

Diaz went and got one bathing suit from the bathroom, brought it out and showed it to defendant. He asked her if she had another, whereupon she brought out a second suit. Upon

being asked to see the first suit again, Diaz returned to the bathroom.

As Diaz took the bathing suit off the shower rod, she looked up to find defendant in the bathroom pointing a black gun at her. He told her to get down from the rim of the bathtub and that if she screamed he would kill her. He then ordered her to remove her clothing because "all he wanted was to see me", but that he would not penetrate her. Diaz removed her jewelry, belt and sandals, then told defendant she needed a drink to calm down. Instead, she took a bottle of alcohol, threw it in defendant's eyes and struggled for the gun, screaming all the while. Defendant ultimately fled, leaving a bag containing pictures, one of which showed him wearing an eagle pendant, his identification, phone book and bullets. There was no camera in the bag, nor was there film. Furthermore, Diaz testified that defendant had no camera on his person.

Diaz was not cross-examined.

### Summation and Charge Regarding Identification and the Diaz Testimony

On summation, defense counsel repeatedly stated that there was no issue regarding identification, that the only issue was whether the sexual relations between defendant and Consolazio constituted rape or were consensual. The prosecutor also commented that there was no question of whether defendant and Consolazio had sexual intercourse, but that the sole issue was whether it was a forced or consensual act. However, in his summation, the prosecutor added that this was "not a case of identification * * * you know not only Marilyn Pizarro *[sic]* [Consolazio] but also have Jessica Diaz that *this is the man who did it in both instances*" (emphasis added).

Defense counsel expressly requested that the court issue no instruction regarding identification. However, the court said that it would charge that if the jury believed identification was in issue, the jury should consider the Diaz testimony. The court in fact instructed that if the jury had "a reasonable doubt as to the issue of identification in this case * * * you may refer to [the Diaz] testimony to the extent that it may assist you in deciding that issue and that issue alone, of identity." The court also issued a general caution that the Diaz testimony should not be considered as establishing a predisposition or propensity of defendant to commit the

crimes charged. Following the summations and charge, the court noted that defense counsel "has an exception as to any and all reference to Miss Diaz."

## Discussion

It is axiomatic that evidence of uncharged crimes is inadmissible unless there is a logical link to a specific material issue in the case at trial. *(People v Hudy,* 73 NY2d 40, 54; *People v Ventimiglia,* 52 NY2d 350, 359.) This is because of the inherent danger, long acknowledged by this and other courts, that the finders of fact will, due to human nature, be more likely "to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime". *(People v Molineux,* 168 NY 264, 313; *People v Robinson,* 68 NY2d 541, 547; *People v Sanza,* 121 AD2d 89.) However, evidence of similar crimes may be admitted for the limited purpose of proving a material fact in issue, provided that there is indeed a question of fact, and that the evidence will not serve merely to "bootstrap" the People's case by showing a criminal propensity to commit the charged crime. *(People v Robinson, supra,* 68 NY2d, at 550, *People v Beam,* 57 NY2d 241, 251; *see also, People v Molineux, supra.)*

We note at the outset that defendant was entitled to the benefit of a ruling, if not when the prosecutor announced his intention to call Diaz, then certainly before the cross-examination of Consolazio. *(People v Ventimiglia,* 52 NY2d 350, 356, 360-361, *supra.)* The court's refusal to make what it called an "anticipatory ruling" constituted error and deprived defendant of the ability to make an informed decision as to how to proceed during the trial.

In particular, where, as here, the People seek to introduce other crime evidence to prove identity, the People must meet a two-prong test. First, identity must in fact be in issue and not have been conclusively established. *(People v Beam, supra* [defendant's testimony, as well as cross-examination of complainant, put identity in issue]; *People v Allweiss,* 48 NY2d 40 [identity of the killer primary issue at trial]; *cf., People v Torres,* 155 AD2d 226 [reversing where court permitted evidence of uncharged crimes to establish modus operandi in case where identity not in issue].) Therefore, the identity exception to the *Molineux* rule is not available in cases where the identity of the defendant is conclusively established by other evidence. *(People v Condon,* 26 NY2d 139, 142.)

Second, for crimes to be admitted in order to establish a modus operandi showing identity, the court must resolve the question of "whether the defendant's *modus operandi* [is] sufficiently unique to tend to establish his identity". *(People v Beam, supra,* 57 NY2d, at 250 [defendant would offer victim marihuana, take him to a football field, overpower him, and force kisses, then oral, then anal sodomy]; *People v Allweiss, supra,* at 48 [defendant had a "compelling interest in lingerie" and would tell victims about the rape of his fiancée/wife].) There must be "evidence of a concurrence of common features, i.e., time, place, and character or of distinguishing oddities" to establish modus operandi and therefore, a material element of the People's case. *(People v Johnson,* 114 AD2d 210, 212.)* We have repeatedly noted that in the absence of a *unique* modus operandi, it is an abuse of discretion for a trial court to admit evidence of similar crimes to establish identity. *(People v Bines,* 137 AD2d 431, 432, *lv denied* 71 NY2d 1023 [no unique modus operandi to be gleaned from record]; *People v Sanza,* 121 AD2d 89, 95, 97, *supra* [uncharged rapes not admissible to establish defendant's identity as perpetrator of rape/murder, because common elements of threats at gunpoint and theft of jewelry are not unique or uncommon in rapes]; *People v Johnson, supra.)*

In the case herein appealed, in the first instance, identity was not in issue. Defense counsel repeatedly offered to concede identification during the various applications and during the People's case. More to the point, counsel stated that defendant would testify to engaging in sexual activity with Consolazio, which defendant in fact did. Thus, the People's argument on appeal that defendant's identity was not conclusively established is meritless.

In any event, the Consolazio and Diaz incidents were more dissimilar than similar. While the court specified that it was permitting the Diaz testimony because both crimes allegedly involved attempts to take photographs, defendant took no photographs, nor was he even in possession of a camera, during the Diaz incident. Other substantial differences abound: Consolazio testified, as did defendant, that they had met prior to the alleged rape, while Diaz met him only once. While defendant allegedly pushed his way into Consolazio's home, he was invited into Diaz's abode. While defendant supposedly initially approached Diaz with the "you could be a model" line, he never attempted to take pictures, while Consolazio contended that defendant exhibited a fetish for the

actual taking of pictures and had her sign a consent form only after the rape had been completed. Additionally, Diaz testified that her assailant merely wanted to view her without clothes, while Consolazio asserted that defendant told her he was raping her because she had earlier spurned his attentions. Moreover, the guns allegedly used were of completely different descriptions. *(Cf., People v Condon, supra,* 26 NY2d, at 144; *see also, People v Neu,* 126 AD2d 223, 225-226, *lv denied* 70 NY2d 652.)

Given the pains the defense took to remove identification as an issue, the length of time the complainant and defendant were together, the defendant's concessions as to identification and sexual activity, and the host of distinguishing facts between the Consolazio and Diaz incidents, we must determine that the probative value of the Diaz testimony was minimal, while the prejudice visited upon defendant was insurmountable. *(People v Robinson, supra,* 68 NY2d, at 549-550.) Moreover, the prosecutor's comment on summation coupled with the final jury charge issued as to the use of the Diaz testimony increased by tenfold the possibility that the jury would consider the testimony as exhibiting defendant's propensity to commit the crime charged.

■ Although not raised as an issue on appeal, and while this court is mindful of the fact "that the sentencing decision is a matter committed to the exercise of the *court's* discretion and that it can be made only after careful consideration of all facts available at the time of sentencing" *(People v Farrar,* 52 NY2d 302, 305), we believe that the sentence imposed, consisting of concurrent terms of 12½ to 25 years' incarceration on the sex crimes consecutive to a 12½-to-25-year term of incarceration on the related burglary, appears to be excessive. While not mitigating the seriousness of the crimes charged, were we to have upheld the conviction, we would have been inclined to modify appellant's sentence, to the extent of imposing concurrent, rather than consecutive sentences of 12½ to 25 years, as it is within our province to do. *(People v Maier,* 102 AD2d 804.)

Accordingly, the judgment of the Supreme Court, New York County (Kleiman, J.), rendered July 13, 1987, convicting defendant, after a jury trial, of rape in the first degree, sodomy in the first degree and burglary in the first degree, and sentencing him, as a predicate felony offender, to concurrent terms of 12½ to 25 years' incarceration on the sex crimes counts and a consecutive term of 12½ to 25 years' incarcera-

tion on the burglary count, should be reversed, on the law, and the matter remanded for a new trial.

ASCH, J. (dissenting). The opinion by the majority asserts that: "In the case herein appealed, in the first instance, identity was not in issue. Defense counsel repeatedly offered to concede identification during the various applications and during the People's case. More to the point, counsel stated that defendant would testify to engaging in sexual activity with Consolazio, which defendant in fact did."

However, the record reflects that the evidence did not conclusively establish defendant's identity and, hence, the identity exception set forth in *Molineux (People v Molineux, 168 NY 264)* should apply, authorizing the People to adequately prove defendant's identity *(see, People v Beam, 57 NY2d 241, 251)*.

The record shows careful consideration by the court, at all stages, of whether the issue of identity had been raised, whether the defendant's identity had been conclusively established and whether the pattern employed in the two crimes was sufficiently unique. Contrary to the conclusion reached by the majority here, defendant questioned the proof of his identity at every turn and repeatedly stated his intention to pursue an identification defense. Thus, prior to the opening of the trial, the District Attorney told the court:

"Judge, as you know, the case of *People v Molineux* and its progeny involve situations where you can prove an incident similar to the one with which the defendant is charged when the circumstances surrounding the two incidents are so unique and so similar that they address one of·several key issues, one of which is identification.

"THE COURT: The first issue is, is the issue of identification the issue that is going to be raised in this trial?"

The court then asked defense counsel: "Are you going to raise the issue of identification?" and defense counsel answered "Yes". After the People's direct examination of the complaining witness, Marilyn Consolazio, and before his cross-examination of her, defense counsel said:

"In view of this problem concerning Molineux, I cannot proceed to cross-examine until the issue is resolved because it will affect which way I go with my defense and my cross-examination will have to reflect a defense.

"If your Honor is going to indicate that Molineux may be

used to admit the Bronx case for the purpose of establishing identity, then I *may be* prepared to concede the identity issue and move the defense in a different direction based on activities that may have taken place in that apartment and elsewhere.

"If your Honor suppresses the Molineux issue, then I *might* move in a different direction concerning the question of identity." (Emphasis added.)

The court then told counsel that it would not make an anticipatory ruling at that time and that it was not its function to suggest the strategy of defense counsel.

Thereafter, toward the end of the People's case, the People gave a detailed offer of proof as to the testimony Jessica Diaz would furnish under the *Molineux* doctrine. Apparently, at that time, for the first time, defense counsel noted: "In any event, the defendant at this time in this trial is not going to challenge the identity issue. We do not intend to raise the identity issue. Defendant will testify at trial. He will admit being present at that time and place with Miss Pizzaro [Consolazio]. He will tell a different version of events as to what took place. I will not raise the identification issue in my summation. I will not allude to it. We will concede that he was there, only that there is a different version of facts as to what actually in fact took place. I understand, of course, if the defendant shouldn't testify that the People might be in a position to raise this issue again but that is the defendant's present position."

In response to that, the court noted that it had deferred its ruling with respect to the admissibility of the prior charged crime and previously had stated that it would make its ruling based upon the application of the law to the facts as then presented. The court pointed out: "You then proceeded at that time, and you raised extensively during the course of cross-examination, the issue of identification. The issue is therefore before the Court and cannot be withdrawn simply by either your concession or statement which is not a statement unless the People want to enter into a stipulation."

After the People refused to make such a stipulation, the court noted that defense counsel "implied that if this is admissible, then the defendant may testify or probably would testify and therefore you would take the issue out. If it's not admissible then you reserve your right to argue the issue before the jury on both identification and any other defense

you may wish to offer. As I said then decisions are not made based upon the strategic determination of the defendant."

The court then allowed the introduction of the other Bronx crime under *People v Molineux (supra).*

Further, although defense counsel *at that time* was willing to stipulate or concede, etc., it is abundantly clear that at that time identity was indeed at issue and was not conclusively established. In fact, until the moment when the evidence of prior crimes was admitted, defendant questioned the proof of his identity at each possible occasion. Defendant offered to withdraw the identification issue and conceded only to prevent Diaz from testifying after it was patently clear to Criminal Term that identification was an issue and had not been conclusively established by the People.

Defendant's trial testimony was, of course, after the fact, i.e., after the court's ruling, and could not serve to render the identification issue moot at the time the court made its ruling. However, it is interesting to note that defendant in his testimony denied that he had any contact whatever with the victim on the date of the crimes charged, asserting that he had left New York two days earlier. Thus, defendant's testimony, contrary to defense counsel's prior attempted stipulation, left open the question of who the attacker of Consolazio was, leaving identity still at issue.

Further, although the majority notes that the court refused to conduct a *Ventimiglia* hearing before the cross-examination of Consolazio, the court, in *People v Ventimiglia* (52 NY2d 350), said: "There is, moreover, a greater probability of error, and consequent waste of scarce judicial resources, when evidentiary rulings are made during trial than in the more relaxed atmosphere of an inquiry out of the presence of the jury. Whether some time prior to trial, just before the trial begins *or just before the witness testifies* will depend upon the circumstances of the particular case" *(supra,* at 362; emphasis added).

Indeed, as the People correctly note, when similar crime proof is offered on the issue of identification, it would make little sense to render a ruling before all the other proof of identification has been presented. Here, it appears the court took its obligation seriously to decide whether defendant's identity had already been "conclusively established". Accordingly, the timing of the trial court's ruling, i.e., toward the close of the People's case but *before* any testimony by Diaz, was proper *(see, People v Condon,* 26 NY2d 139, 142).

While the majority also asserts that the Consolazio and Diaz incidents were dissimilar rather than similar, defendant upon this appeal does not argue that the pattern employed in both crimes was not highly unique, therefore abandoning on appeal the contention he raised in the trial court. In any event, contrary to the interpretation of the majority, the facts of both crimes were remarkably similar, with the defendant employing an unusual modus operandi. Thus, with respect to Consolazio, defendant, in the presence of her two young children, took some photographs, and when she refused to let him take nude pictures, he forced her into the bathroom, where he sodomized and raped her. He warned her after the crime not to report it and compelled her to sign a "consent form", used by professional photographers, which recited that defendant had taken photos of her for a fee. About two months later, after defendant met Jessica Diaz on the street and told Diaz that he was a *professional photographer,* they went to her house, before going to his office to take pictures, to ascertain what wardrobe she had for the pictures. There, at gunpoint, he ordered her to disrobe, in the bathroom again, and threatened to kill her. This planned rape, however, was thwarted when she threw rubbing alcohol in his face. He fled but left pictures of himself, and various identification cards, behind.

Thus, the defendant's modus operandi was sufficiently unique to make the evidence of the uncharged crime probative of the fact that he committed the one charged *(see, People v Condon, supra,* at 144), and the defendant's identity remained in dispute up until the time that the court made its ruling. It was put into issue by the defense cross-examination of the victim, which raised questions concerning the validity of the identification *(see, People v Beam, supra,* at 251).

The majority concedes that the defendant has not raised the extent of the sentences as an issue on the appeal. Therefore, it is not now before us. Moreover, because of the heinous nature of the acts committed by the defendant, there is no basis to interfere with the sentences imposed by Criminal Term.

Accordingly, the judgment of the Supreme Court, New York County (Kleiman, J.), rendered July 13, 1987, convicting defendant, after trial by jury, of rape in the first degree, sodomy in the first degree and burglary in the first degree, and sentencing him, as a predicate felony offender, to concurrent terms of 12½ to 25 years on the sex crime counts and a consecutive term of 12½ to 25 years on the burglary count, should be affirmed.

ROSENBERGER and ELLERIN, JJ., concur with CARRO, J.; ASCH, J., and SULLIVAN, J. P., dissent in a separate opinion by ASCH, J.

Judgment, Supreme Court, New York County, rendered on July 13, 1987, reversed, on the law, and the matter remanded for a new trial.