THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID
R. FERRINGER, JR., Appellant.

Fourth Department, November 10, 1986

## APPEARANCES OF COUNSEL

*Fern Acomb* for appellant.

*Ronald L. Fancher, District Attorney (Robert Noonan* of counsel), for respondent.

## OPINION OF THE COURT

BOOMER, J.

In one indictment, defendant was accused of assaulting Judith Hoff at the Holiday Inn in Batavia, New York, and of murdering 17-year-old Christine Acquino minutes later, a short distance away. Upon appeal from his conviction of assault in the third degree and three counts of murder in the second degree, entered upon a jury verdict, defendant raises

three issues. His principal contention is that the court erred in denying his motion for a severance of the assault count from the murder counts. He also contends that his uncounseled confession to the murder should have been suppressed for two reasons: first, because his right to counsel indelibly attached when the police obtained a warrant to search for evidence concerning the murder; and second, because his right to counsel indelibly attached when he was arraigned on the assault charge, thus barring the police from questioning him, in the absence of counsel, about the murder.

■ ■ ■ The convictions should be affirmed. Neither the issuance of the search warrant nor defendant's arraignment on the assault charge barred the police from questioning defendant about the death of Christine Acquino. And, because of the facts peculiar to the two crimes, it was proper to try the assault and murder counts together.

## I

On Friday, September 21, 1984, at approximately 11:45 P.M., while Judith Hoff was in the ladies' room at the Holiday Inn in Batavia, New York, a young man emerged from one of the stalls and, with closed fists, punched her repeatedly in the head and face. The first two blows knocked her down and the young man continued to strike her in the face as she was lying on the floor. She tried to fight back but every time she raised her head from the floor he struck her again. In order to save herself, she stopped screaming and pretended that she had passed out. Only then did her assailant stop hitting her and leave. She gave a detailed description of her assailant to a policeman who arrived a few minutes afterward. As the result of the savage beating, Judith received deep cuts over her eyebrows, lips and forehead, and her face was severely bruised and swollen.

At trial, defendant admitted that he entered the ladies' room and punched Miss Hoff in the face. He said that he panicked when she started screaming and he struck her "maybe five, six times", and that he continued to strike her until she stopped resisting. He struck her, he said, because a severe beating about the eyes would make it difficult for her to identify him. He continued to strike her to stop her from screaming because it made his head throb. He fled because he was afraid that many people would arrive in response to her screams.

The description Miss Hoff gave of her assailant was broadcast over the police radio. Police Officer Zola heard the broadcast and at 12:27 A.M. he saw defendant, who matched the description, riding a bicycle two blocks from the Holiday Inn. The officer took defendant to the police station where defendant, after being given his *Miranda* warnings, admitted assaulting Miss Hoff and signed a detailed statement. Among the items taken from defendant at the police station was a buck knife with a four-inch blade, but no sheath.

That morning, a Saturday, defendant was arraigned at the jail by a City Court Judge who advised defendant of his right to an attorney. Defendant did not ask the Judge for an attorney, nor was an attorney assigned at that time.

At about the time defendant was being arraigned on the assault charge, Christine Acquino's next-door neighbor found her partly nude body in his back yard, less than a block away from the Holiday Inn. Cleat marks and a knife sheath were near the body. The medical examiner found severe head injuries involving bruises, cutting and swelling about the face, eyelids and lips, indicating a beating with a blunt instrument which could have been a fist. She also found sperm and phosphatase in the vagina and a laceration in the opening of the vagina. She concluded that Christine Acquino died from the multiple blows to the face and that she had been raped before she died.

Christine Acquino was last seen alive by her schoolmates at 11:45 P.M. the night before, September 21, as she left a high school dance at nearby Batavia High School. At approximately midnight, as he was walking home from the dance, another schoolmate saw a girl walking in the same direction, 250 to 300 feet ahead of him. He continued to watch her as she was joined by a young man on a bicycle. When he lost sight of them they were within a few hundred feet of where Christine Acquino's body was found.

After the police learned the details of the homicide, they applied for a search warrant to take defendant's clothes and a sample of his blood. The warrant was issued at 4:40 that afternoon and defendant's clothes and his blood sample were taken and tested. As a result of the tests, it was determined that: defendant had type A blood, the same type of blood group substance found in the seminal fluid in Christine's vagina; a fiber in the knife sheath found at the scene was the same as the fibers of defendant's shirt; a tuft of fibers on

defendant's jacket matched the fibers of Christine Acquino's ripped bra; a paint chip on her jacket was similar to the paint on the decal of defendant's T-shirt; a fiber found on the blade of defendant's knife was similar to the fibers of Christine Acquino's shirt; the cleat marks found near the body were consistent with the tread of defendant's boots; and mud on defendant's boots and pant leg was similar to the soil at the scene of the crime.

After defendant's clothes were taken and before they were tested, defendant was given his *Miranda* warnings and questioned about the death of Christine Acquino. He gave an oral and then a written statement, which he signed, describing the murder in detail. He admitted that he struck Christine Acquino in the face "again and again" until she stopped screaming.

Other trial evidence tending to establish defendant's guilt of the murder was the testimony of his girlfriend, who said that defendant had owned a knife that he carried in a sheath attached to his belt, and that the knife taken from defendant and the sheath found at the scene of the murder looked like defendant's knife and sheath. Further, an inmate of the Genesee County Jail testified to incriminating statements made by defendant. In explaining the charges against him, defendant said the police were holding him on an assault charge and a trumped-up charge of suspicion of murder; that a female had been murdered near Gateway Drive. Defendant admitted that, in the ladies' room of the Holiday Inn, he had struck a woman after she screamed. "Then", said the witness, "he lowered his head and turned away from me and I heard him say something as to the fact of the girl, the girl, and he tried to hit her, he said he tried to hit her, punch her eyes out so she could not identify him. He said that a few times." Later, defendant repeated, "the girl, the girl".

Defendant testified that he did punch Judith Hoff in the face 5 or 6 times, but he denied that he had anything to do with the homicide of Christine Acquino. He said that after he left the Holiday Inn he hid for 15 to 20 minutes and then rode his bicycle down the street, where he was stopped by the police.

Although he admitted voluntarily giving the statement about the assault on Judith Hoff at the Holiday Inn, he denied telling the police that he had attacked Christine Acquino. He explained that when he admitted he had killed someone, he

thought that the police were referring to the incident at the Holiday Inn.

## II

■ We reject defendant's first contention that his right to counsel indelibly attached on the murder charge when the police obtained a search warrant. As stated in *People v Samuels* (49 NY2d 218, 221-223), the defendant is entitled to counsel at all critical stages of the criminal prosecution. The right to counsel attaches once the criminal action commences, but it may also attach at an earlier stage if there has been significant judicial activity. Where the criminal prosecution has formally commenced, the right to counsel indelibly attaches and defendant may not thereafter waive the right to counsel in the absence of counsel. Where, however, there has been significant judicial activity, but the criminal prosecution has not formally commenced and the crime is still under investigation, the right to counsel may attach, but that right can be waived in the absence of counsel. The *Samuels* court explained *(supra,* pp 221-222): "In *People v Coleman* [43 NY2d 222], where the right to counsel was triggered by a court order directing the defendant to appear in a lineup, we held that a waiver in the absence of counsel was possible. There, however, the crime was still under investigation and the defendant had not been formally charged."

Drawing a distinction between the filing of the felony complaint, which triggers the indelible right to counsel, and the court order in *Coleman (supra),* the court continued: "A felony complaint is not an application for an investigatory order. Indeed if the court issues an arrest warrant on the basis of the complaint, it must direct that the defendant be promptly brought before the court for arraignment (CPL 120.10, subd 1) and not to the police station for questioning." *(People v Samuels, supra,* p 222.) Here, the issuance of a search warrant is equivalent to an investigatory order which does not commence the criminal proceeding. Hence, defendant's right to counsel did not *indelibly* attach and he could waive his right to counsel in the absence of counsel.

## III

■ Nor, contrary to defendant's second contention, did the arraignment on the assault charge bar the police from questioning defendant about the murder. Once defendant was arraigned on the assault charge, his right to counsel on that

charge indelibly attached and he could not be questioned on that charge in the absence of counsel *(People v Samuels,* 49 NY2d 218, *supra).* Moreover, had defendant been assigned counsel on the assault charge, he could not have been questioned on the murder charge in the absence of counsel. But since defendant had not been assigned counsel, nor had he asked for counsel, he could, in the absence of counsel, waive his right to counsel and be questioned on the murder charge. See, *People v Kazmarick* (52 NY2d 322, 324): "A pending unrelated criminal case upon which an arrest warrant has issued does not bar the police from questioning a suspect when the suspect does not in fact have counsel on the unrelated charge." The legal fiction of representation because of commencement of an action is not the same as actual representation by counsel or a request for counsel *(People v Kazmarick, supra,* p 328).

Defendant does not argue that the charges are so related that the police were barred from questioning him about the murder because he had been arraigned on the assault charge. For the purpose of interrogation, they are not so related. Even where two crimes were so similar that the *modus operandi* of one led to the solution of the other, they were not deemed to be related in the sense that representation on one crime precluded the police from questioning about the other *(see, People v Taylor,* 27 NY2d 327; *People v Ermo,* 47 NY2d 863, 867 [Gabrielli, J., dissenting]). Where, however, the police interrogation was not discrete or fairly separable and the police exploited impermissible questioning concerning the charge on which defendant had been arraigned to elicit admissions concerning the unarraigned charge, the admissions concerning the unarraigned charge were suppressed *(see, People v Ermo, supra,* p 865). Here, the two crimes were discrete so the police could inquire about the circumstances of the murder without eliciting information about the assault. In questioning defendant about the murder of Christine Acquino, the police were not seeking information about the prior assault upon Judith Hoff. Although proof of the assault was admissible to prove the identity of the murderer *(see,* IV, *infra),* proof of the murder was not admissible to prove the identity of the person who committed the assault, since defendant had admitted the assault.

## IV

The motion to sever the assault count from the murder

counts was properly denied because proof of the assault was admissible as evidence of the identity of the murderer. Two offenses are joinable and may be tried together when "either proof of the first offense would be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first" (CPL 200.20 [2] [b]).

Defendant contends that the assault and the murder charges were not joinable since proof of one was not admissible as evidence upon a trial of the other. He disputes the claim of the prosecution that the *modus operandi* of both crimes was "so unique that the mere proof that the defendant had committed a similar act would be highly probative of the fact that he committed the [murder]" *(People v Condon, 26 NY2d 139, 144).*

In *People v Condon (supra),* defendant committed two armed robberies at two different liquor stores a week apart using the same handgun. Upon his trial for the second robbery, evidence was received concerning the first robbery. The Court of Appeals held that this was error, stating: "There must be some additional factor relating the crimes other than the similarity thereof, in order to permit evidence of the uncharged crime to aid in the proof of the one charged * * * This is not to say, however, that in a proper case *modus operandi* would not be a sufficient connection, for we can envision crimes so unique that the mere proof that the defendant had committed a similar act would be highly probative of the fact that he committed the one charged; (e.g., the identifiable characteristics of the crimes committed by the notorious 'Jack the Ripper'). It is our opinion, however, that in the instant case, the crime charged is not so unique as to allow admission of evidence of the second crime on the theory of the similarity of the *modus operandi." (People v Condon, supra,* p 144.)

In *People v Beam* (57 NY2d 241), between mid-February and May, five young men reported to the police incidents of homosexual assaults. In each case the description of the attacker was similar and in each case the attacker offered to share marihuana with his victim. Upon the trial for one of the assaults, evidence was received of the others. The Court of Appeals stated (p 252) that "[t]he use of the identity exception was thus proper if it can be said that the alleged conduct was sufficiently unique to be probative on the issue of identity." In reciting the similarities of the crimes, the court stated that three of the young men were approached in the same general

area of the City of Binghamton and that the pattern of the initial encounter and the specifics of the serial acts indicated a unique *modus operandi (see, People v Beam, supra,* p 253).

In *People v Allweiss* (48 NY2d 40, 45-46), on defendant's trial for rape and murder, six women testified that they had been raped by defendant during the five months preceding the homicide. In each case defendant followed the woman into a residential building as she returned alone to her apartment, grabbed her by the throat and threatened to strangle her if she did not do what he said. In each instance he rummaged through the victim's lingerie and if a slip were found he directed her to wear it. In the three most recent cases, he used the victim's pantyhose to bind her before the rape or to aid in his escape. During these incidents he often mentioned his wife or fiancée. Four women described defendant's voice as low-keyed. All six rapes occurred in Manhattan, three on the upper west side and the rest on the lower east side, within a block of the last victim.

In restating the rule allowing proof of other crimes to establish identity, the court said: "[I]n order to identify the defendant in this manner it is not sufficient to show that he has committed similar acts if the method used is not uncommon. Simply categorizing the defendant as one of many criminal specialists would be of little probative value in determining whether he committed the crimes charged, and the prejudice would be obvious * * * There must be some additional factor to set the defendant's crimes apart from the ordinary so that 'the mere proof that the defendant had committed a similar act would be highly probative of the fact that he committed the one charged' *(People v Condon, supra,* at p 144; see, also, *People v Kennedy,* 27 NY2d 551; McCormick, Evidence, § 190)." *(People v Allweiss, supra,* pp 47-48.)

The court found that the "peculiar" features of the crime were the bizarre story the defendant told about the rape of his wife or fiancée and his compelling interest in lingerie. In holding that the *modus operandi* of the several crimes was sufficiently unique to permit the jury to infer that they were committed by the same person, the court commented that it was unlikely that there would be many persons with the same interest in lingerie "operating in the same neighborhood, at the same time, all with similar voices" and employing identical methods in raping their victims *(People v Allweiss, supra,* p 48).

In *People v Andrews* (109 AD2d 939), between 11:30 P.M. and midnight two separate incidents occurred. In each a woman was attacked from behind and her throat was slashed. The Third Department (p 942) held that these separate incidents were joinable because: "[T]he offenses involved unprovoked attacks on lone young women, near to each other in both place and time. In each assault, the victim was attacked from behind and had her throat slashed with a sharp object. In neither case was there a robbery nor any other apparent motive other than gratuitous violence. Since defendant's identity was in issue and since the *modus operandi* in each of the attacks was so unique, evidence of each of the attacks was material and admissible as evidence-in-chief of the other attack".

In *People v Christopher* (65 NY2d 417), defendant was tried on three charges of murder of three young black men within a 26-hour period on the east side of Buffalo. In holding that proof of one crime was admissible to prove the identity of the perpetrator of the others, the Court of Appeals noted (p 426): "[T]here [was] more than the race of the victims to make the evidence probative of identity: the short space of time in which the three murders occurred, the unprovoked nature of each, the facts that they occurred in the same general geographical area, that the same type of weapon was involved in each and that defendant owned such a weapon."

Here, "[t]here [are] some additional factor[s] relating the crimes other than the similarity thereof, in order to permit evidence of the [one] crime to aid in the proof of the [other]" *(People v Condon, supra,* p 144). It cannot be said that "the method used is not uncommon", nor does the proof simply "categoriz[e] the defendant as one of many criminal specialists" *(People v Allweiss, supra,* p 47). The most peculiar feature of the two incidents was the brutal and repeated punching of the victims, lone females, in the face and eyes. Not only was the method of attack upon these women unique, but the timing and location made it more than likely that they were committed by the same person. As was said in *People v Allweiss (supra,* p 48): "[I]t is unlikely that there would be many with this particular interest operating in the same neighborhood, at the same time" *(see also, People v Andrews, supra,* p 942 [where nearness "in both place and time" was a significant factor in determining whether proof of one unique crime was probative on the issue of identity of the person who committed the other]; *People v Christopher, supra,*

p 426 [noting that the crimes occurred within a "short space of time" and "in the same general geographical area"]). Under the circumstances of this case, where both of these unique attacks took place within a city block and within 15 to 30 minutes of each other, proof of the first crime is probative of the identity of the perpetrator of the second.

Although there was other evidence of defendant's identity as the murderer, proof of the assault was, nevertheless, admissible on the issue of identity. "[U]nless the defendant's identity is *conclusively* established, the identity exception set forth in *Molineux* should apply to enable the prosecution to adequately prove the defendant's identity." *(People v Condon,* 26 NY2d 139, 142, *supra; People v Beam,* 57 NY2d 241, 251, *supra.)*

### V

■ Even if we were to hold that the failure to sever was error, it would be harmless. The proof against defendant was overwhelming. His confession, giving details of the crime known only to the killer, was persuasive evidence of his guilt. The confession was convincingly corroborated by all of the other evidence, including his statement to his jail mate, his presence near the scene of the crime both shortly before and shortly after its occurrence, the presence of his sheath at the scene, and the forensic evidence concerning his blood type, the soil on his boots, his cleat marks at the scene and the fibers found on his clothing and on the clothing of the deceased. "[T]he detailed and graphic confessions, once these were properly found admissible, when added to the corroborative web of circumstantial evidence, presented a picture of guilt so overwhelming that it left no reasonable possibility that the evidence in question contributed to the conviction" *(People v Hopkins,* 58 NY2d 1079, 1083).

Without proof of the assault, the result would have been no different. In fact, without proof of the assault, the confession to the murder would have been unassailable because, without informing the jury of the assault, defendant could not have argued, as he did, that the confession related not to the murder, but to the prior assault.

Accordingly, the judgment should be affirmed.

DENMAN, J. P., PINE, LAWTON and SCHNEPP, JJ., concur.

Judgment unanimously affirmed.