OPINION OF THE COURT
Seymour Rotker, J.
Facts
The current charges arise from a sting operation whereby it is alleged that two undercover police officers, using the aliases of Jose Jimenez and Joey Torres, initially sought medical treatment at “The Wellness Center” located at 94-38 59th Avenue, Elmhurst, Queens, on or about October 8, 2002.[1] The officers claimed that they had been injured in an automobile accident or accidents. Each officer met separately with defendant.
It is further claimed that each officer met with defendant for an examination or evaluation on October 8, 2002 and that defendant suggested a course of treatment for each officer which included referrals for other medical treatment and tests, which included neurological testing.[2] The prosecution alleges that defendant never performed an initial examination of either undercover, having never gotten up from behind his desk, yet defendant billed the insurance company for performing these examinations that were never performed. Furthermore, it is alleged that the total amount of billing to the insurance company initiated by defendant’s initial examination, and thereafter calculated by referrals based upon the examinations that did not occur, totaled in excess of $3,000 for each undercover officer.
*741 As part of its continuing investigation, the District Attorney’s office sought and obtained a search warrant for the location at issue and 91 patient files were confiscated.[3]
Thereafter, defendant was arrested and charged on or about December 11, 2002 with commission of these crimes. On September 2, 2003, a four-count indictment was filed charging defendant with acting in concert to commit two counts of insurance fraud in the third degree (Penal Law § 176.20) and two counts of falsifying business records in the first degree (Penal Law § 175.10). The trial in this matter is currently pending before this court.
Current Application
After having this matter referred to it for trial, this court conducted a conference with counsel. As a result of that conference, the People have moved by order to show cause, dated August 4, 2004, for the following relief: (1) admission at trial of eight patient medical records from the Wellness Center[4] to show defendant’s “intent, motive, knowledge, absence of mistake or accident, common scheme or plan and modus operandi” in allegedly committing the crimes for which he is currently indicted; (2) admission at trial of the above-stated records to rebut any claim by defendant that his actions were not intentional, the result of a mistake or were not part of his alleged insurance scheme to defraud; (3) admission at trial of such records to impeach defendant’s credibility should he testify at trial; (4) admission at trial of defendant’s suspension from practicing medicine in 1991 with supporting record to show lack of mistake in allegedly committing the within crimes; and (5) admission of defendant’s 1991 suspension for the purpose of impeaching defendant’s credibility should he testify at trial.
In response, defendant has filed papers in opposition, dated August 18, 2004, arguing, inter alia, that admission of the eight *742 patient files and of defendant’s suspension from the practice of medicine with supporting papers, either on their direct case or on cross-examination, would cause undue prejudice and would deprive defendant of a fair trial. Thus, defendant claims that the People’s application should be denied in its entirety.
The People’s rebuttal affirmation to defendant’s opposition, dated August 27, 2004, again asserts that the patient records they seek to admit “do not reflect the examination of injured individuals and recommendation for appropriate treatments” but that these records are the “creation and . . . [are] fraudulent records [created] to unjustifiably initiate billing” to insurance companies for the defendant and for other medical providers at the Wellness Center and other establishments.[5] The prosecution emphasizes that the reports are “essentially identical” and that defendant’s reliance on minor discrepancies misconstrues the prosecution’s application whereby they seek to introduce “the entire physical examination and findings sections of each medical report, and significantly the subsequent findings, prognosis, opinion, and necessary treatment sections of the medical records.” (See People’s response at 3.) The People argue that these reports clearly demonstrate the intent of defendant to ensure that the medical clinic he worked at would benefit from treatments ordered or received for all of the selected patients, regardless of the injuries suffered.
' Furthermore, the People claim that range of motion tests for the eight selected patients were “apparently” not even conducted or recorded. (See People’s response at 5.) Moreover, it is asserted that none of the patients required only minimal or no treatment which is incredible. Thus, the People again seek admission of these alleged uncharged crimes.
Point One: The Eight Patient Files
(a) The Seized Medical Reports are Inadmissible under Molineux for the Propositions Asserted and the People May Not Use These Records on Their Direct Case.
Evidence of uncharged crimes or bad acts is admissible only when offered for a purpose other than to raise the inference that a defendant has a criminal propensity. (See People v Alvino, *743 71 NY2d 233 [1987].) The rationale behind this rule is to prevent a jury from drawing the impermissible inference that since the defendant has done something in the past, he must be guilty presently. (See People v Alvino, supra.) A determination of the admission of such evidence as per Molineux is a question of law. (See People v Molineux, 168 NY 264 [1901]; People v Fiore, 34 NY2d 81 [1974].) If the evidence whose admission is sought is probative of a legally relevant and material issue, it is an exception to the general rule barring admission and the court may exercise its discretion whether to allow such evidence at trial. (See People v Ventimiglia, 52 NY2d 350 [1981]; People v Allweiss, 48 NY2d 40 [1979].) The evidence may be properly admitted to demonstrate a defendant’s motive, intent, absence of mistake or accident, a common plan or scheme or identity. (See People v Molineux, supra; see also People v Alvino, supra.)
Here, the People argue that the eight patient reports they seek to introduce are admissible under a number of exceptions created in People v Molineux (168 NY 264 [1901]). The People seek admission under the following theories enunciated in Molineux: “to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; [and] (5) the identity of the person charged with the commission of the crime on trial.” (See Molineux, supra at 293.) The People have not convinced the court that any of these exceptions indeed apply and it appears that the prosecution is quoting the Molineux decision in an attempt to get the evidence before the jury on their direct case without proper support.
Initially, this court is not convinced that the eight patient records, out of a total of 91 records seized, clearly show fraud on the part of defendant.
In any event, a balancing must be done by the court when considering admission of such evidence to ensure that its admission is not outweighed by undue prejudice to the defendant. (See People v Alvino, supra.)
The prosecution has not demonstrated that the uncharged crimes are so unique as to make the evidence highly probative. (See Allweiss, supra; see e.g. People v Miguel, 146 AD2d 808 [2d Dept 1989] [court improvidently exercised discretion by permitting admission of two prior uncharged attempted larcenies at same store to prove identity].)
Moreover, identity is not at issue; thus, the court fails to see how this exception to admission is applicable. Furthermore, the *744 People have not demonstrated that the evidence is admissible under the common plan or scheme since it is not so inextricably interwoven as in some of the cases upon which they rely to support this proposition.[6] Additionally, although this case does involve a crime of intent, it is this court’s opinion that intent, and thus absence of mistake or accident, may be inferred from the charged crimes for which defendant is on trial involving two incidents of insurance fraud with two different undercover officers. (See People v Vargas, 88 NY2d 856 [1996] [court properly denied admission of prior uncharged sexual misconduct to prove intent, although it was element of crime, since issue was one of credibility whereby defendant claimed consent and intent could be inferred from act itself].)
In opposition, defendant argues against admission of the eight patient files claiming they are unreliable because there is no way to determine if they contain false information. The court agrees with this position since it is unclear that actual fraud is present in the files since the prosecution has not indicated that the patients have been spoken to and have confirmed that the tests did not actually occur.
Defendant also points out that the eight patient reports are not identical[7] and the People are merely identifying the similarities in the reports. Furthermore, as to any similarities found in the reports of these eight patients, defendant claims that all of these individuals had minor car accidents, and therefore, it *745 would be expected that they would have the same or similar complaints and symptoms.
Additionally, defendant asserts that the prosecution has not demonstrated the necessity of admitting the reports. Defendant states that the People’s case is dependent upon a factfinder’s analysis of the credibility of the officers and, therefore, defendant states that the admission of the reports is unnecessary because admission would “lend credibility” to the testimony of the undercover officers by suggesting that defendant was guilty of the within crimes because he had prepared false reports in the past.
Defendant states that the People have not explained why they chose these eight reports out of all those in their possession for introduction at trial and that they do not reflect a fair sampling of the seized records. Moreover, defendant argues that the People have not demonstrated an exception to admissibility for the records on their direct case.
Furthermore, defendant claims that in order to refute the prosecution’s assertions that he regularly falsified reports and did not conduct examinations, it would be necessary for him to call dozens of patients examined by defendant at the Wellness Center. This, it is asserted, would divert the attention of the jury away from the actual charged crimes and would cause a long and protracted trial.[8]
In any event, defendant contends that even if the reports technically related to a fact to be proven, the prejudicial effect would outweigh the probative value because the danger exists that the factfinder would view these items as indicative of a criminal propensity on behalf of defendant.[9]
The court has reviewed the proposed evidence and concluded that the People have not satisfied the court that admissibility upon their direct case would not be unduly prejudicial to defendant.[10] Although, it is not necessary to prove every fact and circumstance relating to extraneous crimes that would be es *746 sential to a conviction thereof as long as relevant and competent to the issue on trial, the court is not convinced that the admission of these reports would be proper. It is not clear that actual fraud exists in the proposed files or if there is a question that some degree of negligence may be present on the part of defendant. As to their claim that the eight patient reports are fraudulent, it is apparent that the People have not based their conclusions upon actual discussions with the patients whose records they seek to introduce. Here, the People are seeking to introduce these eight records on their direct case for the proposition that the examinations did not occur or were perhaps unnecessary.[11]
Again, while the findings in these records and the similarities may raise suspicions and may be suspect to an interpretation that fraud could be the cause, this court is not satisfied that if the People were permitted to utilize these records on their direct case that undue prejudice would not be caused to defendant. Thus, admission would not be more probative than prejudicial under these circumstances. (See Molineux, supra at 318.)
Moreover, prejudice not only addresses the nature of the crime,[12] but also “the difficulty faced by the defendant in seeking to rebut the inference which the uncharged crime evidence brings into play.” (People v Robinson, 68 NY2d 541, 549 [1986], citing People v Bay, 67 NY2d 787, 789 [1986].) Here, the court has weighed this factor in making its determination as to the admissibility of the records for the alleged uncharged crimes on the People’s direct case.[13]
Furthermore, although the prosecution relies upon a number of cases that relate to forgery to support their position that the patient records should be admissible upon their direct case to show intent, these cases do not deal with the same or similar facts. It is this court’s opinion that the evidence of the uncharged crimes is not necessary to prove the intent element required for the charges in this indictment. Here, the crimes involving two separate undercover officers for at least two sepa *747 rate incidents are sufficient alone to establish the necessary elements of the charged crimes should the factfinder deem the witness testimony credible.
It is asserted by the prosecution that the reports would be used to show defendant’s intent to commit the crimes with which he is charged, and that no mistake occurred. The People rely on a number of cases to support their position which are distinguishable.
In People v Dales (309 NY 97 [1955]), the defendant was charged and convicted of uttering a forged instrument with intent to defraud. The court permitted the admission of uncharged crimes, the introduction of three documents that had either “a spurious signature or a fictitious vehicle described as collateral” (at 100) which had also been delivered to the bank by the defendant. The defendant argued that this evidence should not have been admitted because his defense in the case was that he had the authority to sign the person’s name that he was accused of forging. The same type of claim has not been made here. Furthermore, as discussed, the intent element of the within crime here is evident according to the allegations sought to be proven and are sufficient to prove intent without admission of the alleged uncharged crimes. The Dales court found that, in the case before it, intent was not easily inferred; thus, the uncharged crime evidence was admissible. {Dales, supra at 101.) It is notable that in Dales, the defendant himself had elicited testimony of other past dealings with the bank and evidence of other contracts and notes covering the sale of used vehicles to negate the issue of fraudulent intent, unlike in the present case, which was a factor considered by the Court when it found the admission of the evidence proper under the circumstances.[14]
*748 (b) The Eight Patient Files are Admissible under Sandoval for Cross-Examination.
However, should defendant take the stand, the People are permitted to question defendant as to the course of conduct and examinations performed upon these patients. Thus, should defendant testify, the People are permitted to question defendant as to the underlying facts and circumstances contained in the eight patient files whereby fraud is claimed. (See People v Sandoval, 34 NY2d 371 [1974].) “[T]he commission of crimes involving individual dishonesty, such as theft, fraud and forgery demonstrate the defendant’s willingness to place [his] own interests ahead of the interests of society, thereby impacting directly upon the issue of the defendant’s credibility.” (People v Young, 178 AD2d 571, 571-572 [2d Dept 1991] [internal quotation marks omitted], quoting People v Ortiz, 143 AD2d 107, 107 [2d Dept 1988].)
Point Two: The 1991 Suspension
(a) Defendant’s 1991 Suspension is Inadmissible on the Prosecution’s Direct Case; However, Such Evidence is Admissible for Cross-Examination.
The prosecution also seeks admission of defendant’s 1991 suspension on their direct case as evidence of defendant’s lack of mistake in committing the charged crimes and to rebut any claim by defendant that his conduct was a mistake. Furthermore, should defendant testify at trial, the People seek to introduce this evidence to impeach defendant.
The People indicate that defendant was suspended as a result of intentionally lying to his employer when he claimed he was board certified in internal medicine by the American Medical Association. His suspension was also the result of grossly *749 negligent and incompetent treatment of patients.[15] Thus, the People seek to introduce this evidence to show defendant’s alleged continuing pattern of false examination of his patients since he was on notice of the required level of care necessary as a result of the suspension and continued this behavior. The People seek to rebut the evidence of a claim by defendant that he made a good-faith mistake or misunderstood the necessary standard of care.[16]
Addressing the admissibility of defendant’s 1991 suspension from practicing medicine, defendant claims that because defendant “lied to his employer” regarding his qualifications and that it was more than 10 years ago, it does not support the People’s contention that the defendant engaged in a pattern of conducting false examinations. Again, defendant argues that the prejudicial impact of such information would outweigh any probative value. Defendant further asserts that claims of “negligence” committed by defendant in 1991, as opposed to intentional acts, as we now have, do not support the People’s theory of defendant’s current motivation for financial gain.
Defendant also asserts that the eight patient reports and his 1991 suspension should not be admissible for cross-examination should he testify at trial. Defendant argues that the prior acts are too similar to crimes charged and argues the same rationale for denial of admission as outlined above.
Since defendant’s 1991 suspension, where he was found guilty of fraud for misrepresenting that he was board certified to his employers and because this behavior goes directly to his credibility, the People are permitted to question defendant about this aspect of his suspension should he testify at trial.[17] The People are not permitted to use this information on their direct *750 case as the court views it as more prejudicial than probative.[18] (See People v Sandoval, 34 NY2d 371 [1974]; see also People v Jones, 136 AD2d 740 [2d Dept 1988] [court properly admitted evidence that defendant had lied about not having prior conviction in an employment application since it bears on credibility].)
Thus, the People’s application is denied in part and granted in part as outlined herein.

. It has not been established and it is unclear at the present time as to whether the police officers were working in conjunction with the insurance company GEICO.

. The criminal court complaint states that the undercover officers were referred by defendant to an “in-house” neurologist and that each officer received treatment on October 9, 2002, October 16, 2002, October 23, 2002 and November 26, 2002. It was later discovered that this “neurologist,” John Yi, was not a licensed medical professional.

. Upon a review of the facts and the court file herein, the implication asserted hy the prosecution is that defendant’s medical practice was involved in and treated patients who were allegedly involved in motor vehicle accidents covered by New York State’s No-Fault Insurance Law. It is implied by the People that these accidents and/or the treatments alleged to have taken place did not occur or were fraudulent in some way.

. This is one of the medical facilities where defendant practiced and records were seized on December 11, 2002 pursuant to the search warrant that was issued as part of the prosecution’s ongoing investigation. It appears that all of the medical facilities have the same address and are related to one another. The People claim that “The Wellness Center” was one of these facilities.

. Upon a review of the eight patient files, the records submitted are primarily from a number of different facilities which are all located at 94-38 59th Avenue, Elmhurst, New York. It is unclear as to whether any of these facilities are known as “The Wellness Center,” the name of the facility where the undercover officers in the within matter allegedly sought treatment.

. To support their contention of admission under the theory of common plan or scheme, the prosecution relies upon People v Duffy (212 NY 57 [1914]). However, in Duffy, the uncharged crimes that were admitted revealed that they were so inextricably interwoven that a common scheme existed. In Duffy, a police sergeant and another officer exchanged names, places and amounts of money collected from illegal gambling establishments so that when a redistricting occurred in the precinct, collections, or bribes, could continue to be made by the new officer assigned to the area. Here, the facts are distinguishable. Defendant is alleged to have fraudulently billed insurance companies for services that were not performed. Thus, this court considers each allegation as a separate and complete act which is not so related as to rise to the level of a common plan or scheme. (See also, People v Roman, 203 AD2d 493 [2d Dept 1994] [Department of Motor Vehicles investigator’s testimony that he had seen defendant obtain documents for people in exchange for cash properly admitted to show same modus operandi].) Here, no unique modus operandi has been established to the court’s satisfaction.

. Defendant claims that upon his review of the files, the history section of such reports differs, different injuries are reported, some patients were treated at the hospital while others were not, only six out of the eight files indicate that the patients had the same pulse rates, and one of the eight patients had a medical history positive for prior surgery while the others did not.

. Defendant also notes that the eight patient reports are over two years old and it may be difficult for the patients to recall details of their examinations.

. Moreover, defendant speculates that if this evidence is admissible, it would inflame the jury because other evidence which would increase the monetary value of the filed false insurance claims would likely total more than $80,000.

. Nevertheless, should defendant raise the issue of mistake, error or intent during cross-examination, the People may renew their application for introduction of the patient records as rebuttal testimony.

. The court specifically asked the prosecution this question when it conducted a conference with all counsel present and the prosecution stated that they had not spoken directly to the eight patients whose records they seek to admit.

. It is more probable that jurors would be swayed more by the admission of the uncharged crime if it is more heinous. (See People v Robinson, 68 NY2d 541 [1986].)

. The names of the eight patients have been redacted by the prosecution for purposes of this application. The issue of privilege is not addressed here since it was not raised in any of the moving papers.

. To further support their argument for admissibility on intent, the People rely upon People v Bayne (82 NY2d 673 [1993]) in which the defendant, a secretary, was charged with stealing over $700,000 from her employer, as well as forging the complainant’s signature on checks and cashing them. Introduction of 146 checks, upon which the defendant had either changed the monetary amount, or misappropriated the money, was permitted to show the defendant’s intent to commit the charged crimes. Unlike in the present matter, the trial court weighed the evidence and deemed it necessary to prove the intent element for the crime which was presently on trial before the court. This court has not reached the same conclusion and again questions whether actual fraud exists in the eight files or if it is speculation.
Other cases relied upon by the prosecution to support their contention for admission of the eight medical records are also not controlling. In People v *748 Charnoff (121 AD2d 734 [2d Dept 1986]), a grand larceny charge involving two checks, the prosecution was permitted to introduce evidence of other dishonored checks the defendant issued to show intent and to negate the defendant’s claim.of mistake. No mistake has been asserted here. (See also People v Sudler, 116 AD2d 605 [2d Dept 1986] [court admitted 8 out of 15 checks to prove defendant’s intent and to negate his claim of mistake at trial].) These check forgery cases are distinguishable since it was not easily demonstrated by the evidence at trial that the forged checks were executed intentionally; thus, the repetition of prior bad acts was properly admitted to prove a necessary element of the crimes, unlike here.

. The prosecution notes that the findings of negligence were based upon the following: that defendant did not respond to obvious ailments; ordered tests but did not review them; ordered the incorrect tests; did not take appropriate patient histories; and did not conduct appropriate examinations or prescribe proper treatment.

. At this juncture, these claims have not been asserted by defendant.

. Defendant’s assertion that the lapse in time between defendant’s suspension and the current matter is not controlling. The age of a prior conviction or bad act is but one factor the trial court has considered in making its determination and this factor is not controlling. (See e.g. People v Carrasquillo, 204 AD2d 735 [2d Dept 1994].)

. The court has reviewed the findings of defendant’s suspension and although the conduct of defendant was egregious, it appears that the findings were based upon various degrees of negligence by defendant. Thus, these findings do not support the People’s theory of admissibility since intent was not clearly found.